UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JEANETTE MCKEE, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16 CV 207 CDP |
| | ) | |
| MICHAEL REUTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

The three plaintiffs in this case, Jeanette McKee, Susan Hickman and Sharon Rebecca Hickman (referred to as "Beckie") are past Deputy Clerk employees of the Circuit Court of Jefferson County. Defendant Michael Reuter is the elected Clerk of Court, who defeated plaintiff McKee in a partisan election in 2014. Plaintiffs Susan and Beckie supported McKee in the election.

Plaintiffs have sued Michael Reuter and others under 42 U.S.C. § 1983. They allege that after Reuter won the 2014 election, he and the other individual defendants conspired to force plaintiffs out of their jobs because of their political affiliations and because of issues they raised during the election. McKee and Beckie Hickman were both terminated by Reuter and then reinstated by a judicial review committee before they eventually resigned. Susan Hickman retired from her position. In addition to Reuter, plaintiffs' claims are brought against Christy Scrivner, who Reuter appointed

to replace McKee as Chief Deputy Clerk. Plaintiff Beckie Hickman is also suing her direct supervisor, Teresa Cusick.

Now pending before me is defendants' motion for summary judgment on all claims. Defendants argue they are entitled to qualified immunity. As a separate but additional basis for summary judgment, Reuter argues that he was justified in discharging McKee and Beckie. As for Susan who retired from the Clerk's office, defendants argue that her constructive discharge claim fails because she never brought her complaints to the attention of her employers.

Susan admits that she did not complain to Reuter and Scrivner about her working conditions. Because defendants were never provided a reasonable opportunity to work out her problems before she retired, Susan suffered no adverse employment action and her constructive discharge claim fails. As to Beckie's claims against Teresa Cusick and Christy Scrivner, the facts are insufficient to demonstrate a violation of a constitutional right. Cusick and Scrivner are therefore entitled to the defense of qualified immunity as to these claims. However, McKee's claims against both Scrivner and Reuter, and Beckie's claim against Reuter, demonstrate genuine disputes of material fact that are factual sufficient to show a violation of right. Therefore, I will deny summary judgment as to these claims.

## Motion for Leave to Supplement

After defendants' motion for summary judgment was completely briefed, plaintiffs filed a verified motion for leave to supplement the record in opposition to summary judgment. Plaintiffs seek to include in the summary judgment record the decisions of the three-judge panels which reinstated plaintiffs McKee and Beckie after their terminations by Reuter. ECF No. 74. Defendants oppose the motion, arguing that the documents are unauthenticated, hearsay opinions that the plaintiffs have never before produced or relied upon. ECF No. 75.

Plaintiffs' opposition to summary judgment and their response to defendants' statement of facts repeatedly discuss their reinstatements by a judicial review committee. Defendants cannot argue that they were unaware of these documents given that they are employment records provided to them at the time of plaintiffs' reinstatements. I will grant plaintiffs' motion for leave. I will consider the decisions of the Review Committees – not for the truth of the facts that they contain or as proof that the terminations were wrong – but as evidence of the fact that a judicial review committee overturned plaintiffs' terminations and reinstated them.

## Summary Judgment Standard

The standards for summary judgment are well settled. In determining whether to grant a motion for summary judgment, the court views the facts – and any

inferences from those facts – in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant bears the burden of establishing that (1) it is entitled to judgment as a matter of law and (2) there are no genuine issues of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587. At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## Background[1]

In 2014, the three plaintiffs were clerks at the Jefferson County Circuit Clerk's office. McKee was the Chief Deputy Clerk – the highest ranking and paid deputy clerk – working for elected Clerk of Court Howard Wagner. After Wagner announced his intent to retire, McKee began her campaign in March 2014 to be the

---

[1] The relevant facts set out here are viewed in the light most favorable to plaintiffs – as required for summary judgment. Areas of dispute are described in the discussion section below.

next elected Clerk of Court.  McKee ran unopposed in the primary as the Democratic

nominee, and her opponent in the general election was defendant Michael Reuter, the

Republican nominee.  During a "meet the candidates" public campaign event, McKee

commented about Reuter's being accused of domestic violence in his past.[2]  Almost

all the deputy clerks in the Circuit Clerk's office, including Susan and Beckie,

supported McKee in her campaign.  McKee lost the election in November 2014, and

Reuter started as the new Clerk of Court on January 2, 2015.

## I.        Count I: Jeanette McKee

Plaintiff Jeanette McKee started working for the clerk's office in 1989 and

became Chief Deputy Clerk in 1998.  On Reuter's first day as Clerk of Court, before

McKee had even taken her coat off, he told her to move out of the semi-private office

that she shared with Susan Hickman, and to a cubicle outside of his office.  When

McKee asked him about her duties under his new management, Reuter told her she

would still be the Chief.  However, on his second day in office, Reuter held a meeting

for deputy court clerks where he introduced defendant Christy Scrivner as the new

Chief Deputy Clerk.  Immediately following the general clerks meeting, Reuter met

with just the supervisors.  Despite being a clerk and a supervisor, Reuter told McKee

that she was "not allowed" and "not needed" at the meetings because "nothing

---

[2]Reuter admits that he was arrested for domestic violence in 2000, based on a complaint made by
his wife.  No charges were ever filed; however, his wife did request and receive a temporary Order
of Protection against him.  ECF No. 71-1 at 20-23.

pertained" to her. The following day Reuter humiliated McKee when he publicly requested her parking pass and all office keys because she was no longer the Chief. Around this same time, Reuter had two cameras installed in the office which he used for the following six months. ECF Nos. 71-4 at 152, 154-61; 71-1 at 34, 26-33; 67-1 at 87.

After replacing her as Chief, Reuter told McKee to help train Scrivner in her new position. Three days later, McKee went on medical leave until early February. When she returned, Reuter gave her a notice of Corrective Action, reprimanding her for refusing to help Scrivner on two occasions before her medical leave, in violation of his direct order. McKee denied refusing to help Scrivner and appealed the notice. Reuter assigned McKee to a microfilming position – a position that did not previously exist – as punishment. After review of the notice of Corrective Action by an outside fact finder,[3] Reuter withdrew the reprimand in late February but did not move McKee out of microfilming until the following week. ECF Nos. 71-4 at 116-117,168, 170, 179; 67-4.

On April 2, 2015, McKee exchanged words in a disagreement with one or two nonparty employees in the office. Six days later Reuter dismissed McKee and had

_____

[3] McKee points out that the fact finder appointed by Reuter to review her appeal was not 'independent' because the person appointed had previously contributed to one of Reuter's wife's political campaigns. ECF No. 71-4 at 170-72. Despite this, McKee cannot show any injury resulting from his appointment; his report suggested that the Corrective Action against her be withdrawn.

her escorted out of the building.  Around this time, Scrivner wrote the word "Karma" on the board outside her office.  McKee appealed her termination to the presiding judge and a three-judge panel was appointed to review the decision.  The Review Committee held a hearing where both Reuter and Scrivner testified against McKee. The Committee found McKee's termination unreasonable and ordered her reinstatement on June 11, 2015.  ECF Nos. 71-4 at 104-11, 176-79; 71-6 at 90-91.

Upon reinstatement, Reuter assigned McKee to a position in the traffic division on the first floor of the building, with duties considerably below her qualifications. Defendant traffic supervisor Teresa Cusick told McKee that Reuter said she could not go to the second floor, where the main clerk's office was located.  Other clerks in the office told McKee that they felt Reuter did not want them to talk to her.  McKee resigned from her position soon after reinstatement.    ECF No. 71-4 at 75-76, 179.

## II.    Count II: Susan Hickman

When Reuter started as Clerk of Court, plaintiff Susan Hickman had been working in the clerk's office for more than twenty-five years.  Susan supported McKee in her election campaign, shared an office space with her, and attended McKee's appeal of termination hearing to provide moral support.  After Reuter started as Clerk of Court, he and Scrivner transferred Susan to several different positions – she was a "floater" throughout the office – and her duties changed

"constantly."  Although Susan maintained her "supervisor" title, she supervised no one and was often assigned to perform entry level duties.  ECF Nos. 67 at ¶50; 71-4 at 177; 71-6 at 23, 52-53, 82.

Reuter told Susan to help Scrivner learn the responsibilities of her new position as Chief Deputy Clerk.  However, having never done the job herself, Susan was unfamiliar with many of the duties required of that job, and felt that Scrivner was often angry with her for not being able to answer her questions.  At one point, Scrivner locked the office door, stuck her finger in Susan's face, and insisted that Susan help her.  Susan assured her that she would help as much as she could.  ECF No. 71-6 at 23-24, 56.

Around March 2015, when Susan and Reuter were discussing deferred compensation benefits by a bulletin board in the office, Susan realized Reuter was staring at her crotch area while she was talking.  She asked him multiple times why he was staring at her and he finally answered, "cause I can."  Susan retired from her position in the clerk's office in June 2015.  ECF No. 71-6 at 83-85.

### III.    Count III: Beckie Hickman

Beckie Hickman had been with the clerk's office over four years, and was assigned to the support division when Reuter took over as Clerk of Court.  In July 2015, Reuter transferred Beckie to the traffic division to work under supervisor

Cusick.  While working in traffic, Cusick berated and demeaned Beckie by calling her "stupid," telling her that she "had a mental handicap," and that she "would never learn the job."  Cusick asked her questions like "do you have to stand so close to me?" and "do you have to be in my – my area?"  Beckie was not "trained consistently" in that she did not take classes "like other people got chances to" and overall "other clerks got a lot more training."  Beckie was not allowed to sit by a newer-to-traffic employee that she felt would be more helpful in answering her questions and training her.  Cusick required Beckie to keep her phone on do not disturb and Cusick gave her conflicting instructions on things like whether to answer the phone and whether to go to the window.  Cusick gave Beckie negative performance reviews, which Beckie contends were unwarranted.  When asked if she believes that Cusick gave her the negative reviews because she is a Democrat, Beckie said she did not know why Cusick did it.  ECF No. 71-5 at 12-13, 16, 53, 55, 58.

Beckie brought her complaints of mistreatment and insufficient training to Reuter, while Scrivner was present in his office.  Reuter did not respond to these complaints.  Despite Beckie's having satisfactory performance reviews before moving to traffic, Reuter would not transfer her to a different position even though other employees were moved when they had problems.  After three months of poor reviews, Beckie received a notice of Corrective Action in which Cusick

recommended to Reuter that Beckie be transferred or terminated. On October 13, 2015, Reuter terminated her. Beckie appealed her termination under court rules to the presiding judge and a hearing was held before a three-judge Review Committee. In March 2016, that Committee found Beckie's termination unreasonable and ordered that she be reinstated.

Following her reinstatement and return to the traffic department, Beckie had carpal tunnel surgery. Reuter did not respond to her request for light duty. She eventually had a nervous breakdown resulting in a medical leave of absence. Near the end of September 2016, Beckie was told that the judges of the court would allow her to remain an employee, with unpaid time off, if she sent in a letter. She faxed a letter and then confirmed with Scrivner by phone that the letter was received and that Scrivner had everything that was needed. On October 5, 2016, Beckie called Scrivner to inform her that she was not up to returning to work. Scrivner told her that her faxed letter was undated and if she did not return to work the following day, she would lose her job. Beckie tendered her resignation. ECF No. 71-5 at 13-16, 73-75, 81-82, 90-92.

<u>Discussion</u>

## I. §1983 Liability and Political Discrimination

The three plaintiffs claim that defendants conspired to force them out of their jobs due to their political support of Democrat McKee in the 2014 election. For a public employee, §1983 "imposes liability for certain actions taken 'under color of' law that deprive a person 'of a right secured by the Constitution and laws of the United States.' " *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982)). "[A] public employee acts under color of law when he 'exercises[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). A civil rights plaintiff pressing a conspiracy claim must "show that two or more individuals conspired for the purpose of depriving [the plaintiff of a constitutional right] … and that an act was done in furtherance of the conspiracy that caused an injury or deprivation to another." *Marti v. City of Maplewood, Mo.*, 57 F.3d 680, 685 (8th Cir. 1995).

Plaintiffs allege that defendants violated their First Amendment right of political free speech. It is undisputed that "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427

U.S. 347, 356 (1976)).  In political discrimination[4] cases, the Eighth Circuit applies a

burden-shifting test:

> the threshold burden [is for the employee] to produce sufficient direct or
> circumstantial evidence from which a rational jury could find that political
> affiliation was a substantial or motivating factor behind the adverse
> employment action.  At that point the employer must articulate a
> nondiscriminatory basis for the adverse employment action and prove by a
> preponderance of the evidence that it would have been taken without regard to
> plaintiff's political affiliation.

*Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011) (quoting *Rodriguez-Rios v.

Cordero*, 138 F.3d 22, 24 (1st Cir. 1998)).  Plaintiffs have the initial burden of

showing they suffered an adverse employment action that was substantially motivated

by their political beliefs or affiliations.  *Id.* at 271.  Substantial or motivating factors

can be shown through either direct or indirect evidence, and the motivating factor

need only have played a part in the adverse employment action.  Once plaintiffs have

met their prima facie burden, defendants must show that they would have made the

same employment decisions regardless of political affiliation or belief.  *Id.*

## II.     Susan Hickman's Claim of Constructive Discharge

Susan retired from her position in the clerk's office; her employment was never

terminated and then reinstated, like McKee's and Beckie's.  Susan alleges that she

---

[4] Defendants' motion for summary judgment described plaintiffs' claims as those of political
retaliation instead of political discrimination.  According to the Eighth Circuit, a claim of First
Amendment political discrimination rather than retaliation is stated when the claim is based on
status or affiliation.  *Wagner v. Jones*, 664 F.3d 259, 269 (8th Cir. 2011).  Plaintiffs' claims here are
based on their affiliation as Democrats.

was forced to retire by intolerable working conditions. A constructive discharge is an adverse employment action that occurs when an employer deliberately makes an employee's working conditions intolerable in order to force the employee to quit. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981). "To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit." *Id.* An objective standard is applied to determine whether a constructive discharge occurred. *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 858 (8th Cir. 1998). Nonetheless, if an employee leaves without giving her employer a reasonable chance to work out the problem, the employee is not constructively discharged. *Id.* (citing *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995)).

Susan admits that she did not complain to Reuter or Scrivner about her working conditions. ECF No. 71 at ¶ 54. Because Susan gave her supervisors no reasonable opportunity to respond to her complaints before voluntarily retiring, her constructive discharge claim fails. Susan suffered no adverse employment action. See *Taylor v. Farmland Foods, Inc.*, No. C00-1010, 2001 WL 34148158, at *5 (N.D. Iowa July 24, 2001) (employee resigned before giving employer any opportunity to address alleged discriminatory treatment, therefore his resignation was not a constructive discharge or an adverse employment action). Because Susan cannot

establish an adverse employment action, she cannot make a prima facie showing of political discrimination. Count II will be dismissed.

## III. Qualified Immunity

When a state actor is sued in her individual capacity, she can plead an affirmative defense of qualified immunity, as all three defendants have done here. "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't.*, 570 F.3d 984, 988 (8th Cir. 2009). The court may address either prong first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In 1976, the Supreme Court established that the dismissal or threatened dismissal of employees based on their political affiliation violates the First and Fourteenth Amendments. *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion). In 1990, the Court extended this rule to the failure to promote or transfer employees as

well.  *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990).  Given this clearly-established law, in order to defeat a defense of qualified immunity, plaintiffs must demonstrate a violation of these constitutional rights.  An examination of qualified immunity under the summary judgment standard of viewing the facts in the light most favorable to the plaintiff, "usually means adopting ... the plaintiff's version of the facts."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  In considering the facts for qualified immunity, each defendant's conduct must be evaluated individually.  *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805-06 (8th Cir. 2010).

### A. <u>Teresa Cusick</u>

Beckie is the only plaintiff with a claim against defendant Teresa Cusick.  Beckie alleges Cusick mistreated her at the instruction and direction of Reuter and because of political reasons.  Cusick began working in the Jefferson County Clerk's office in 1981.  Cusick states that, like Susan and Beckie, she supported McKee in her campaign for Clerk of Court.  There is no indication that Beckie disagrees with this statement, as most clerks in the office in 2014 campaigned for McKee.  ECF No. 71-5 at 36.

Before and after the election, Cusick was the supervisor in the traffic division.  While supervising Beckie, Cusick claims Beckie (1) issued arrest warrants for the wrong person; (2) failed to issue warrants in a timely manner; (3) failed to check her

office mail for a month; and (4) performed incompetently.  Cusick recommended to

Reuter that Beckie either be terminated or transferred to another department.  Beckie

does not deny making these mistakes; she just said she does not "recall" them.  She

admitted to incorrectly dating a document and that she was "sure [she] did make

mistakes by not being trained right."   ECF Nos. 67-22 at ¶ 2, 5, 7, 9; 71-5 at 31-32,

55-57.

In order to overcome a defense of qualified immunity, the facts must

demonstrate that Cusick violated Beckie's rights.  Viewing the facts in Beckie's

favor, there is insufficient evidence to demonstrate such a violation.  Beckie alleges

that Cusick's behavior and statements created a hostile environment for her in the

traffic division.  The court recognizes that Cusick treated Beckie badly, said mean

things to her, and occasionally gave her conflicting instructions.  However, like

Beckie, Cusick was herself a supporter of McKee in the 2014 election.  Even Beckie

admitted that she did not know why Cusick acted as she did towards her.  ECF No.

71-5 at 53.  There is no evidence of intent by Cusick to deprive Beckie of her

employment due to her political affiliation.

Although Cusick's notice of Corrective Action recommended transfer or

termination of Beckie, Cusick's actions were based on a nondiscriminatory reason:

Beckie's poor job performance.  There is no foundation for Beckie's statement that

the poor reviews she received were unwarranted.  When questioned about specific mistakes on the job, Beckie either did not recall making the mistake or admitted to the mistake.  No genuine dispute exists here.  Beckie's claim against defendant Teresa Cusick fails.  Cusick is entitled to the defense of qualified immunity and she will be dismissed from this suit.

## B. <u>Christy Scrivner</u>

On his second day in office, Reuter named defendant Christy Scrivner as the Chief Deputy Clerk, replacing McKee.  It is undisputed that Scrivner had no relevant work experience, qualifications, or training when she started in the clerk's office.  She had never been in a courthouse and did not know what it meant to be a clerk.  Michael Reuter and his wife[5] knew Scrivner from being frequent customers in her pizza restaurant before the election.  Scrivner describes herself as neither a Republican nor a Democrat.  However, she supported both Michael Reuter and his wife in their 2014 campaigns on the Republican ticket by walking in a parade, wearing a 'Reuter' t-shirt, putting a sign in her yard, and handing out flyers at a poll on Election Day.  ECF No.71-7 at 21-25, 28, 47-53.

Plaintiffs McKee and Beckie allege that Scrivner's appointment as Chief Deputy Clerk was in exchange for her assistance in making working conditions

---

[5] Michael Reuter's wife, Renee Reuter, was also originally named as a defendant in this case but she was dismissed on November 17, 2016.  ECF No. 55.  Renee is an elected district representative on the County Council.

intolerable for them – that Reuter and Scrivner conspired to coerce the plaintiffs' resignations through onerous working conditions. Beckie's only allegations against Scrivner are that Beckie complained to Reuter about working conditions in Scrivner's presence, and that Scrivner told Beckie that her leave-extension paperwork was in order, when it was not. These allegations do not demonstrate a violation of Beckie's constitutional rights. There is no evidence of political discrimination based on Beckie's party affiliation or her support of McKee. Furthermore, there is no evidence of a conspiracy between Reuter and Scrivner for the purpose of depriving Beckie of a constitutional right. See *Marti*, 57 F.3d 680 at 685. Scrivner is entitled to qualified immunity on Beckie's claims against her.

However, qualified immunity will not protect Scrivner against the claim brought by McKee. Despite having no experience or training, Scrivner replaced McKee as Chief Deputy Clerk and then filed a false complaint against her on their second day working together. The complaint led to the issuance of a notice of Corrective Action – McKee's first reprimand in her twenty-five years at the office. Scrivner was a public employee performing her official duties when she testified against McKee at her appeal termination hearing. Scrivner verified her support of Reuter's dismissal of McKee by writing the word "Karma" on the board outside her office. According to Scrivner, the reprimand was justified because McKee refused to

answer her questions and failed to help train her.  When Scrivner testified at the appeal hearing, she said she was not providing her opinion on McKee's termination, only answering questions as required by her job.

A dispute exists as to whether Scrivner's actions against McKee were politically motivated or based on legitimate, nondiscriminatory reasons.  Thus, accepting the facts in the light most favorable to McKee, they are sufficient to demonstrate a violation of McKee's rights.

### C. <u>Michael Reuter</u>

The facts against Reuter, viewed in a light most favorable to McKee and Beckie, also create genuine disputes of fact sufficient to establish violations of right and defeat a defense of qualified immunity.  According to McKee, Reuter forced her out of her job because of her political affiliation by: removing her from her semi-private office to a desk right outside his office on his first day before she had even taken off her coat; installing two office cameras that he used during her employment under him; publicly humiliating her when he took her office keys and parking pass; intentionally excluding her from office meetings; replacing her as Chief Deputy Clerk with someone completely unqualified, despite telling her that she would remain Chief; telling other clerks in the office not to talk to her; assigning her to microfilming as a punishment; issuing her a notice of Corrective Action in conspiracy

with Scrivner and based on false information; terminating her employment based on false information; assigning her to a position significantly below her qualifications following her reinstatement; and restricting her presence in the main clerk's office. McKee also argues that Reuter wanted to get back at her for statements she made during the campaign, questioning his qualifications and notifying people of an adult abuse Order of Protection against him.

In response, Reuter states that he moved McKee outside his office so she could assist him more closely because she was the most knowledge clerk; that he installed the cameras for his protection; that he told her not to come to the office meeting because there were customers who needed help at the clerk's office window and she had already met Scrivner; and that he advised McKee not to come to the second floor after reinstatement in order to lighten the tension between employees. Reuter argues that he had a legitimate, nondiscriminatory reason for McKee's termination: her outburst in the office on April 2, 2015. Reuter collected written statements from employees who described McKee as yelling and cursing at coworkers. ECF No. 67-9 to 67-17. McKee disputes her ex-coworkers accounts of the incident, and argues that the incident was not a sufficient basis for dismissing her after many years of service with no previous disciplinary marks. The evidence shows numerous factual disputes; McKee's evidence, if believed, could show a constitutional violation.

The facts as alleged by Beckie against Reuter also demonstrate genuine disputes. According to Beckie, Reuter denied her multiple requests to transfer out of the traffic division despite allowing other employees to transfer upon request; failed to respond to her complaints of mistreatment by supervisor Cusick or her request for light duty after having surgery; failed to provide her with sufficient training in her traffic position, nor the same amount of training provided to other clerks; and terminated her with insufficient grounds given her clean employment record at the office. Reuter argues that Beckie's deficient performance in her employment duties was a legitimate, nondiscriminatory basis for termination. These genuine disputes of fact create issues for trial and preclude a summary judgment based on qualified immunity.

## Conclusion

Because a political discrimination claim requires a prima facie showing of an adverse employment action, plaintiff Susan Hickman's claim fails on the merits as she admits that she never brought her working condition complaints to her employer before retiring. Furthermore, plaintiff Beckie Hickman cannot establish a violation of her constitutional rights by Scrivner and Cusick; therefore Scrivner and Cusick are entitled to the defense of qualified immunity on her claims.

However, genuine disputes of material fact exist as to McKee and Beckie's claims against Reuter, and as to McKee's claim against Scrivner. When the facts are viewed in the light most favorable to plaintiffs, they are sufficient to establish constitutional violations and require the denial of the defense of qualified immunity for these defendants on these claims. The factual disputes also preclude summary judgment on the merits of the claims. A jury must decide whether the facts show adverse employment actions taken against plaintiffs, motivated by a constitutionally protected First Amendment right of political belief and association, and not based on legitimate, nondiscriminatory reasons.

Based on the foregoing,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#65] is GRANTED in part and DENIED in part. Defendants Reuter and Scrivner are entitled to summary judgment on Susan Hickman's claims in Count II, and Susan Hickman's claims are dismissed in their entirety. Defendants Scrivner and Cusick are entitled to qualified immunity on the claims of Beckie Hickman contained in Count III. The counts of the Amended Complaint that remain for trial are: Count I, brought by Jeanette McKee against Michael Reuter and Christy Scrivner, and Count III, brought by Beckie Hickman against Michael Reuter.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to supplement

the record in opposition to defendants' summary judgment motion [#74] is

GRANTED.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 5th day of September, 2017.