UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEANETTE MCKEE, et al.,           )
                                  )
                Plaintiffs,       )
                                  )
        v.                        )        No. 4:16 CV 207 CDP
                                  )
MICHAEL REUTER, et al.,           )
                                  )
                Defendants.       )

## MEMORANDUM AND ORDER

This matter was tried to a jury on plaintiff Jeanette McKee's claims of

constructive discharge against Jefferson County Circuit Clerk Michael Reuter and

Chief Deputy Clerk Christy Scrivner, and on plaintiff Sharon "Beckie" Hickman's

claim of constructive discharge against Reuter.   The jury returned a verdict in

McKee's favor on her claim against Reuter, awarding her $25,000 in actual damages

and $200,000 in punitive damages.   The jury returned a verdict in favor of

defendants on McKee's remaining claim against Scrivner and on Beckie's[1] claim

against Reuter.

Now before the Court is defendant Reuter's renewed motion for judgment as a

matter of law under Rule 50(b), Federal Rules of Civil Procedure, and motion for

new trial under Rule 59 on McKee's successful claim.   I will deny these motions.   I

---

[1] I previously dismissed the claims of a third plaintiff, Susan Hickman.   Given that she and
Beckie Hickman share the same surname, I will refer to them by their first names in this
memorandum to avoid confusion.   No disrespect is intended.

will, however, grant in part Reuter's alternative motion to reduce the punitive damages award and will reduce the punitive award to $125,000. McKee and Beckie also move for a new trial on their respective claims against Scrivner and Reuter. I will deny these motions. Finally, because McKee prevailed on her claim against Reuter brought under 42 U.S.C. § 1983, I will award $66,792.24 in attorney's fees and expenses to McKee on this claim.

## Background

Evidence and testimony adduced at trial showed that McKee began working in the clerk's office for the Circuit Court of Jefferson County, Missouri, in 1989. In 1998, she became the chief deputy clerk. In 2014, she was both the highest ranking and highest paid deputy clerk. She was the Democratic candidate to replace the outgoing clerk of court in the November 2014 general election. Defendant Reuter was the Republican candidate in that election. During the course of the campaign, McKee publicly commented that Reuter had been accused of domestic violence and that his wife had earlier obtained an order of protection against him. Several deputy clerks, but not McKee, signed a letter to the editor indicating that they would be uncomfortable working for Reuter given the allegations of domestic abuse.

Reuter won the election and took office on January 2, 2015.

On Reuter's first day on the job, he called McKee into his office immediately upon her arrival at work and told her to vacate her semi-private office and to relocate

to a cubicle located right outside his office. Although he assured McKee that her duties would remain the same and that she would retain the title of chief deputy, he announced at an employee meeting the following work day that Christy Scrivner, Reuter's personal friend and a newcomer to the office with no relevant experience, was the new chief deputy clerk. Reuter directed McKee to not attend this meeting, telling her that it did not pertain to her and that she was to work at the front counter while the meeting was going on. On his third day in office, Reuter loudly directed McKee in front of other deputy clerks to surrender her office keys and parking pass because she was no longer chief deputy. Although the parking pass was reserved for the chief deputy, Reuter required no other supervisor to surrender their office keys.

During his first week in office, Reuter installed security cameras in and near his office. He also contacted the Office of State Courts Administrator in Jefferson City and directed that McKee's access to the statewide court-operated computer system be reduced, in some instances to the lowest level available. He did not reduce any other supervisor's access to the system. McKee told Reuter that she needed access at certain levels in the system in order to perform her duties as a unit manager, but Reuter never restored her access.

McKee worked in the clerk's office under Reuter from January 2 to January 8, 2015. At her doctor's recommendation, McKee then went on medical leave for

stress and anxiety. She was on medical leave for three full weeks and then worked part-time for one week before returning on a full-time basis.

On the day McKee returned from medical leave, Reuter gave her a Notice of Corrective Action based on an email written by Scrivner on January 9 stating that McKee refused to train her and help her with her duties as directed by Reuter. The Notice stated that McKee's attitude was creating a hostile work environment and that if she was unable to obey Reuter's orders or perform her job duties, she would be subject to discipline, including dismissal.

McKee filed a formal grievance with Reuter regarding the Notice, asserting that its issuance was politically motivated. Reuter referred the grievance to an outside factfinder, an attorney who had previously worked with Reuter's wife. In the meanwhile, Reuter reassigned McKee to an isolated, windowless office (a converted vault) and instructed her to perform microfiche tasks while the grievance was being investigated. McKee did not have access to a telephone or computer while assigned to that room. After investigation, the factfinder recommended to Reuter that he withdraw the Notice of Corrective Action and permit McKee to return to her desk outside Reuter's office. Reuter withdrew the Notice on February 25, and he permitted McKee to return to her desk. Upon her return, McKee noticed that other deputy clerks would not talk to her. McKee testified that this silent treatment lasted for weeks.

On April 2, 2015, McKee was involved in an argument with other deputy clerks about office gossip. When Reuter questioned McKee about it, she told him that he condoned this "shit." Reuter terminated McKee's employment and had her escorted from the building. When leaving, McKee saw the word "karma" written on Scrivner's bulletin board outside her office. McKee contested her termination with Reuter, but he upheld her dismissal. McKee appealed to the court's presiding judge, who referred the matter to a state-wide budget committee, who in turn referred it to a panel of three judges from outside counties. After a hearing, the panel overturned Reuter's decision on June 5 and reinstated McKee with backpay.

McKee met with Reuter on June 11 regarding her anticipated return to work, whereupon Reuter told her that she would be performing entry level work in the traffic division, which was located on another floor in the courthouse. The traffic supervisor then informed McKee that Reuter had instructed that McKee was not allowed in the main clerk's office on the second floor, and that she was to make arrangements with another employee if she needed something from the clerk's office. Upon being advised of these employment conditions, McKee resigned.

On June 15, 2015, McKee began employment as a deputy clerk in the Eighth Circuit Court of Appeals, having interviewed for and been offered a position there before her ordered reinstatement to the Jefferson County Clerk's Office.

On July 1, 2015, shortly after McKee resigned, Reuter transferred plaintiff

Beckie Hickman to the traffic division.   Beckie was a Democrat and campaigned for and supported McKee leading up to the November 2014 election.   Beckie had worked in the clerk's office support division for four years, was assigned to the criminal division in April 2015, and had had no negative performance evaluations. In May 2015, she filed a worker's compensation claim for carpal tunnel syndrome.

After her assignment to the traffic division, Beckie began receiving negative performance reviews from the traffic supervisor, Teresa Cusick.   Cusick also belittled Beckie, calling her "stupid" and telling her that she could never learn the job.   Beckie testified that Cusick did not provide her appropriate training and gave her conflicting instructions on how to perform the job.   Beckie complained to Reuter that Cusick was mistreating her and not providing adequate training, and she requested that she be reassigned back to the support division.   She also told Reuter that, with her pain, she thought she would be better in a different department. Reuter told Beckie that she would be fine, and he did not transfer her.   Cusick eventually recommended to Reuter that Beckie be terminated because of her negative performance.

Beckie received a Notice of Termination on October 13, 2015, after which she wrote a letter to Reuter stating that Cusick's treatment of her constituted harassment, discrimination, and abuse, and that she thought Cusick acted this way because of her worker's compensation claim.   Reuter terminated Beckie's employment on

October 28.

Beckie contested her termination with Reuter, but Reuter upheld her dismissal. Beckie appealed to the court's presiding judge, who referred the matter to a state-wide budget committee, who in turn referred it to a panel of three judges from outside counties. After a hearing, the panel overturned Reuter's decision and reinstated Beckie with backpay. When Beckie returned to the clerk's office in March 2016, she remained in the traffic division. Cusick's negative conduct continued and Beckie again asked Reuter that she be transferred, but he denied her request.

Beckie underwent additional carpal tunnel surgery in April 2016. When she attempted to return to work after surgery, she suffered a nervous breakdown and was hospitalized. While she was on medical leave, Reuter told her that the court authorized her to take unpaid extended leave if she faxed in a written request. She faxed such a request and Scrivner received it. On October 5, 2016, Scrivner told Beckie that because the request was not dated, she was expected to return to work the next day or she would lose her job. Beckie resigned.

## Discussion

A.  <u>Reuter's Renewed Motion for Judgment as a Matter of Law</u>

At the close of all the evidence in the case, Reuter moved for judgment as a matter of law on McKee's claim of constructive discharge, which I denied. Fed. R.

Civ. P. 50(a).   Reuter raised four arguments in that motion, specifically:   1) that Reuter's actions in supervising, directing, assigning duties to, and dismissing McKee were within the scope of his statutory authority; 2) that McKee's working conditions were not so intolerable that she had no choice but to resign; 3) that McKee presented no evidence of Reuter's motives and therefore could not establish that Reuter retaliated against her because of her political affiliation; and 4) that Reuter was entitled to qualified immunity because a) McKee had no clearly established right to be retained on the staff of the official to whom she lost an election, and b) it was reasonable for Reuter to believe he could dismiss McKee because of her disruptive behavior in the clerk's office that occurred on April 2, 2015.   (ECF 148.)

In his renewed motion for judgment as a matter of law under Rule 50(b), Reuter contends that he is entitled to judgment on McKee's claim for three reasons: 1) that McKee failed to present sufficient evidence to show that she suffered a "constitutional injury," which, in the context of this case, must be an adverse employment action; 2) that McKee failed to establish that her work conditions were so intolerable that she had no choice but to resign; and 3) that Reuter was entitled to qualified immunity because he reasonably believed that McKee's public comments made in October 2014 – that his wife accused him of domestic abuse in 2000 and obtained an order of protection – were disruptive to the efficient and effective

operation of the clerk's office, and therefore were not protected under the First Amendment.   Because this last argument was not raised in Reuter's pre-verdict Rule 50(a) motion, I consider it waived and will not address it here.   *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 834 (8th Cir. 2019); *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 900-01 (8th Cir. 2006).[2]   I therefore turn to Reuter's arguments that the evidence failed to establish that McKee suffered an adverse employment action, and namely, constructive discharge.

A motion for judgment as a matter of law should be granted only if the jury's verdict is utterly lacking in evidentiary support.   *In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 571 (8th Cir. 2009).   When deciding a Rule 50 motion, I must construe the evidence most favorably to the prevailing party and draw all inferences in her favor, denying the motion "if reasonable persons could differ as to the conclusions to be drawn from the evidence."   *Western Am., Inc. v. Aetna Cas. & Sur. Co.,* 915 F.2d 1181, 1183 (8th Cir. 1990).   I may not make credibility determinations or weigh the evidence.   *In re Prempro,* 586 F.3d at 572 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).   Under

---

[2] I disagree with Reuter's assertion that it was not until trial when McKee first suggested that her October 2014 public comments about Reuter's domestic abuse issues were among the campaign activities for which Reuter took adverse employment action against her.   This allegation was raised in the amended complaint and addressed in my September 2017 Memorandum and Order and the court of appeals' January 2019 opinion.   Regardless, even if it was first raised or fleshed out at trial, Reuter nevertheless did not bring this qualified immunity argument in his pre-verdict motion for judgment as a matter of law.   Indeed, during argument on his Rule 50(a) motion, Reuter's counsel represented to the Court that he was not pursuing an argument that McKee's campaign activities disrupted the office.

these standards, Reuter's motion must be denied.

First, where an employer's actions or inactions make the employee's working conditions intolerable and the employer either intended the employee to resign or could have reasonably foreseen that the employee would resign, the employee is said to have been constructively discharged, and the employee's resignation is considered an adverse employment action. *Fenney v. Dakota, Minn. & E.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003); *Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 724 (8th Cir. 2003), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). This is because the employee's resignation is not truly voluntary. *Fenney*, 327 F.3d at 717. Accordingly, regardless of whether, as Reuter argues, the relocation of McKee's desk, the loss of her title of "chief deputy," her exclusion from meetings, and her reassignment to microfiche and to the traffic division without being demoted or suffering a pay reduction did not themselves constitute actionable "adverse employment actions," her involuntary resignation itself constituted the adverse employment action for which she sought and obtained redress. Reuter's first ground for relief is denied.

Further, the evidence presented at trial, in its totality and upon review, supports the jury's verdict that McKee's working conditions were so intolerable that she had no choice but to resign.[3] Exhibits and witness testimony presented to the

---

[3] Reuter challenges only whether the working conditions were intolerable. He does not challenge the evidence showing his intent or that McKee's political affiliation or activities during the

jury showed a series of adverse events that occurred to McKee immediately upon Reuter's taking office and continuing into the weeks and months that followed. Despite McKee's being a long-term, knowledgeable, and senior management employee, Reuter immediately ordered her to vacate her office and to relocate to a cubicle outside his office; Reuter excluded her from meetings, including management meetings; Reuter stripped her of her title and relegated her to low level assignments; Reuter denied her computer access that was necessary to perform her job duties; she was the only supervisory employee ordered to surrender office keys; she was ostracized by other deputy clerks; Reuter relocated her to a windowless room without a computer or telephone for a period of weeks while her grievance regarding unwarranted disciplinary action was investigated – disciplinary action that was later withdrawn; and Reuter terminated her after an office disagreement, which termination was later rescinded by a three-judge panel. Reuter's conditions placed on McKee's reinstatement after being fired included being assigned entry level work in the traffic division, being banned from the clerk's office, and having to make arrangements with other employees if she needed something from the clerk's office. After having been subjected to unwarranted disciplinary actions as well as targeted humiliation on a near-daily basis that had already led to stress and anxiety, to have these conditions of employment imposed for her return to work was the proverbial

campaign was a motivating factor in his decision to make McKee's working conditions intolerable.

straw that broke the camel's back.   From this evidence, a jury could reasonably conclude that McKee experienced a series of adverse events that eventually culminated in her having no choice but to resign.

Reuter argues that McKee failed to take steps short of resigning to improve her working conditions, such as accepting her assignment in the traffic division and waiting to see if the conditions were tolerable, or asking Reuter for a different assignment, or lodging a formal complaint and demanding relief.   The evidence at trial, however, was sufficient to support a conclusion that a reasonable person would find such attempts to be futile, especially given the adverse conditions that Reuter continued to impose upon McKee even after she was successful on her formal complaints.

Nothing Reuter presents in his renewed motion for judgment as a matter of law changes my previous conclusion on his pre-verdict motion or serves as a basis for disturbing the jury's verdict.   I will therefore deny the motion.

B.    Motions for New Trial

Under Rule 59(a)(1)(A), "[a] new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice."   *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996).   A miscarriage of justice does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must

demonstrate that there was prejudicial error. *Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 148 (8th Cir. 1997). A new trial based on errors in evidentiary rulings will only be granted where the error likely affected the jury's verdict. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 823 (8th Cir. 2005).

1. *Defendant Reuter's Motion for New Trial on McKee's Claim*

Reuter seeks a new trial on McKee's successful claim against him, arguing that I erred in permitting Michael Gans, Clerk of Court for the Eighth Circuit Court of Appeals, to testify to McKee's job duties in the Eighth Circuit as well as to her character and work ethic. Reuter contends that such testimony provided an improper benchmark for determining whether McKee's working conditions under Reuter were intolerable and, further, improperly painted McKee in a favorable light, to Reuter's prejudice.

I did not err in permitting Gans to testify. I agree with McKee that his testimony to the nature of the work and her ability to perform the work was relevant to the jury's determination of whether the emotional distress for which she sought compensatory damages in this action was caused by the working conditions she experienced under Reuter. Contrary to Reuter's argument, Gans did not testify as to causation of McKee's emotional distress; rather, he testified to his factual observation of McKee's work performance as a deputy clerk for the Eighth Circuit.

Reuter's motion for new trial is denied.

2.     *Plaintiff McKee's Motion for New Trial Against Scrivner*

McKee argues that she is entitled to a new trial on her claim against Scrivner, asserting that the jury's verdict was against the weight of the evidence.   I disagree.

"[T]he prevention of injustice is the overriding principle in deciding whether to grant a new trial on the ground that the verdict was against the weight of the evidence." *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1267 (8th Cir. 1987).   "A motion for new trial is addressed to the judicial discretion of the district court and will not be reversed except for a clear abuse of that discretion." *Id.* at 1267-68. "The court should reject a jury's verdict only where, after a review of all the evidence giving full respect to the jury's verdict, the court is left with a definite and firm conviction that the jury has erred." *Ryan v. McDonough Power Equip., Inc.*, 734 F.2d 385, 387 (8th Cir. 1984).   Where reasonable minds can differ in evaluating the credible evidence, a new trial based on the weight of the evidence should not be granted. *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1267 (8th Cir. 1994).

Here, the evidence and testimony presented at trial supported the jury's verdict that McKee failed to meet her burden of proving that Scrivner's conduct was motivated by McKee's political affiliation and activities and that she acted with the necessary intent to force McKee to resign.   Indeed, in her motion, McKee avers that Scrivner's adverse actions of filing a complaint against McKee on January 9 and permitting the word "karma" to remain on her bulletin board when McKee was fired

in April were done as part of *Reuter's* effort to force McKee to resign, not her own. Based on all the evidence adduced at trial, and upon consideration of the arguments of the parties, I do not find that the verdict against McKee on her claim against Scrivner is against the clear weight of the evidence. Nor am I convinced that the jury erred in reaching this verdict. To the contrary, this case involved conflicting evidence regarding Scrivner's conduct and the reasons for her conduct, "and it is the jury's function to choose between plausible versions of the evidence." *Jacobs Mfg.*, 19 F.3d at 1267. The jury had ample basis to reach the decision it did.

I will also deny McKee's motion for new trial to the extent she argues that I erred in excluding certain evidence showing that Reuter's conduct created intolerable working conditions. Given that McKee prevailed on her claim of constructive discharge against Reuter, it cannot be said that the exclusion of this evidence affected the jury's verdict to her prejudice.

McKee's motion for new trial is denied.

3.      *Plaintiff Beckie Hickman's Motion for New Trial Against Reuter*

Plaintiff Beckie Hickman argues that she is entitled to a new trial on her claim of constructive discharge against Reuter, asserting that the jury's verdict was against the weight of the evidence. I disagree.

The evidence and testimony presented at trial supported the jury's verdict that Beckie failed to meet her burden of proving that Reuter made her working

conditions intolerable, that he acted with the necessary intent to force her to resign, and that he was motivated by Beckie's political affiliation and activities in forcing her to resign. First, while there was evidence of Cusick's engaging in less-than-admirable conduct toward Beckie, there was little evidence that such conduct was politically motivated or was done at the behest of Reuter. To the extent evidence showed that Reuter denied Beckie's request for transfer and terminated her at Cusick's recommendation, again there was little if any evidence that these actions were motivated by political animus. Indeed, evidence showed that when Beckie challenged her termination, she stated that it was Cusick who mistreated her and that such mistreatment was because of her worker's compensation claim.

Beckie also claims that I erred in excluding certain evidence of Reuter's conduct toward another deputy clerk, Susan Hickman, and specifically that Reuter had a habit of leaning over Susan and staring at her. Although Beckie argues that such evidence was admissible and necessary to show Reuter's propensity, practice, and intent to create intolerable working conditions for Jeanette McKee's political supporters, there was plenty of other evidence and testimony adduced at trial, including from Susan, that showed how Reuter treated McKee supporters. Indeed, Susan testified that after Reuter took office, she retained her position as a supervisor but all of her reports were reassigned to another supervisor, thus making her a

supervisor of no one.  She also testified that she was removed from a private office, received several reassignments, and was moved to many different positions in the office; that when she returned to the office after being absent, all of her things had been moved to and piled on a table with no place to set up her computer; that Reuter looked at her inappropriately, and that when she questioned why he was engaging in this inappropriate behavior, he simply responded that it was because he could. Given all the evidence presented to the jury of Reuter's conduct in relation to McKee supporters, Beckie has failed to show how the exclusion of additional evidence that Reuter had a habit of leaning over Susan and staring at her likely affected the jury's verdict.

Beckie's motion for new trial is denied.

## C.    Defendant Reuter's Alternative Motion for Remittitur

Reuter asserts that the $200,000 punitive damages award violates the Due Process Clause of the Fourteenth Amendment, arguing that the 8:1 ratio between the punitive and compensatory damages is too great.  Reuter asks that I reduce the punitive damages award to an amount less than $100,000.

As an initial matter, I note that although Reuter requests a due process review of the punitive damages award, he captions his alternative motion as one seeking "remittitur."  "Remittitur" is "[a]n order awarding a new trial, or a damages amount lower than that awarded by the jury, *and requiring the plaintiff to choose between*

*those alternatives*." *Black's Law Dictionary* "remittitur" (9th ed. 2009) (emphasis added). *See also Miller v. Huron Reg'l Med. Ctr.*, 936 F.3d 841, 846 (8th Cir. 2019). Because remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages, "the traditional remedy of remittitur . . . require[s] the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial[.]" *Ross v. Kansas City Pwr. & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002). A constitutionally-reduced verdict, however, is "'really not a remittitur at all.'" *Id.* (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999)). "'A constitutional reduction . . . is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court . . . a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.'" *Id.* (quoting *Johansen*, 170 F.3d at 1331) (omission in *Ross*) (citations in *Johansen* omitted). Because Reuter asks me only to conduct a due process review of the punitive damages award, I will limit my consideration to that request.

"Juries have considerable flexibility in determining the level of punitive damages." *Ondrisek v. Hoffman,* 698 F.3d 1020, 1028 (8th Cir. 2012) (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 568 (1996)). However, due process prohibits "grossly excessive civil punishment." *Id.* (internal quotation marks and citation

omitted).   The Constitution provides an upper limit on punitive damage awards so that a person has "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that . . . may [be] impose[d]." *BMW*, 517 U.S. at 574.   "Similar to compensatory damages, punitive damages are grossly excessive if they shock the conscience of this court . . . or demonstrate passion or prejudice on the part of the trier of fact."   *Ondrisek*, 698 F.3d at 1028 (internal quotation marks and citations omitted) (omission in *Ondrisek*).

In determining whether a punitive damages award shocks the conscience of demonstrates prejudice, I consider the following factors:

> (1) the degree of reprehensibility of the defendant's conduct;
> (2) the disparity between actual or potential harm suffered and the punitive damages award (often stated as a ratio between the amount of the compensatory damages award and the punitive damages award); and
> (3) the difference between the punitive damages award and the civil penalties authorized in comparable cases.

*Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 602 (8th Cir. 2005) (citing *BMW*, 517 U.S. at 574-75); *see also May v. Nationstar Mortg., LLC*, 852 F.3d 806, 815-16 (8th Cir. 2017).   These factors collectively serve as "guideposts . . . to ensure proper notice of the penalty associated with [the defendant's] conduct." *Ondrisek*, 698 F.3d at 1028.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."

*BMW,* 517 U.S. at 575.   I consider five factors in evaluating the degree of reprehensibility:

> whether . . . the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003).

Here, McKee was not financially vulnerable nor did she suffer significant economic harm.   She did, however, suffer emotional harm.   Given that she had taken a medical leave of absence for stress and anxiety, Reuter's continued mistreatment upon McKee's return from leave shows a reckless disregard to her mental health.   Moreover, as described above, Reuter subjected McKee to a series of adverse events that culminated in her constructive discharge; her involuntary resignation did not arise from a singular event.   Finally, as demonstrated by the jury's verdict, Reuter was motivated by an unlawful factor in subjecting Reuter to intolerable working conditions.   Nothing shows Reuter's conduct to have been accidental.   The reprehensibility factor therefore favors the jury's punitive damages award.

In considering the ratio factor in conjunction with comparable cases, however, I find that the 8:1 ratio of punitive to compensatory damages is excessive. "[A]n award of more than four times the amount of compensatory damages might be

close to the line of constitutional impropriety." *Campbell*, 538 U.S. at 425 (citing

*Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991)).   In *Campbell*, the

Supreme Court observed that legislatively-imposed sanctions of double, treble, or

quadruple damages, while not binding, are instructive in determining whether a

given punitive award serves its objective purpose, that is, to deter and punish.   *Id.*

"[C]ourts must ensure that the measure of punishment is both reasonable and

proportionate to the amount of harm to the plaintiff and to the general damages

recovered."   *Id.* at 426.

　　　A deliberate violation of well-settled law prohibiting discrimination and

retaliation on the basis of political affiliation and political activities deserves both

punishment and deterrence, but a penalty eight times that of non-economic

compensatory damages is excessive.   After considering the nature and extent of

Reuter's misconduct, the short term and long term impact such conduct had on

McKee, a reasonable relation between the compensatory and punitive damages, and

an amount sufficient to punish and deter, I find that a punishment of $125,000

satisfies the broad function of punitive damages.   *See Campbell*, 538 U.S. at 416;

*E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998).   Not only will it punish

Reuter for his reprehensible conduct, but it will serve the important purpose of

deterring him and other public officials, including elected officials, from punishing

their employees for engaging in constitutionally-protected activities.   "The

constitutional harm at issue in the ordinary case consists in large part of discouraging employees . . . from engaging in protected activities." *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1419 (2016). Adverse action against one "tells the others that they engage in protected activity at their peril." *Id.*

Although the resulting ratio of 5:1 is more than four times the amount of compensatory damages, this ratio does not offend the notions of due process in the circumstances of this case. Requiring a modest punitive damages award merely because compensatory damages themselves were modest would diminish and indeed have the potential to negate the purpose of punitive damages in the first place, that is, to punish the wrongdoer and deter future unlawful conduct. McKee was fortunate in this case to have timely secured other employment in a non-abusive environment and to have received timely mental health treatment, both of which resulted in significant mitigation of damages. But McKee's successful mitigation of damages does not lessen the wrongfulness of Reuter's conduct or the constitutional harm he inflicted. To significantly reduce the punitive damages award because of McKee's resourcefulness would serve more to punish McKee than Reuter in the circumstances here and would do little to deter future unlawful conduct.

I will therefore grant Reuter's alternative motion to the extent he seeks to reduce McKee's award of punitive damages under due process considerations, but I

will deny the motion to the extent he seeks to reduce it to an amount less than $100,000. For the reasons set out above, I will reduce McKee's punitive damages award from $200,000 to $125,000.

D.  Plaintiff McKee's Motion for Award of Attorney's Fees

As a party prevailing in a § 1983 case, plaintiff McKee is entitled to recover reasonable attorney's fees and expenses under 42 U.S.C. § 1988 in relation to her successful claim against Reuter. Asserting two alternate theories to recover fees (*i.e.*, lodestar or contingent fee agreement), McKee seeks attorney's fees and expenses totaling *either* $122,007.24 *or* $126,307.24.[4] Because McKee seeks fees and expenses for work performed on unsuccessful claims, including unsuccessful claims pursued by other plaintiffs, I will reduce her request and award $66,792.24 in fees and expenses.

This lawsuit began in February 2016 with two plaintiffs pursuing separate claims against five defendants. Specifically, plaintiff Jeanette McKee brought her claim of constructive discharge against Michael Reuter, Renee Reuter, Christy Scrivner, Missouri Jefferson County Republican Central Committee, and Jefferson County. McKee sought compensatory damages totaling $360,000, plus $200,000 in punitive damages against each defendant (other than Jefferson County). Plaintiff Susan Hickman brought a claim of constructive discharge against these same five

---

[4] McKee also submitted a separate bill for taxable costs (ECF 158) to which Reuter has not objected.

defendants.   Plaintiffs dismissed the Central Committee on March 2, 2016.   An amended complaint filed July 21, 2016, added Beckie Hickman as a plaintiff with a claim of constructive discharge against all remaining defendants as well as against a newly named defendant, Teresa Cusick.   In a Memorandum and Oder entered November 17, 2016, I dismissed defendants Jefferson County and Renee Reuter from the action.

On September 5, 2017, I granted in part and denied in part the remaining defendants' motion for summary judgment.   As a result, Susan Hickman's claims were dismissed in their entirety, and Beckie Hickman's claims against Scrivner and Cusick were dismissed on the basis of qualified immunity.   My determination to deny qualified immunity to Reuter and Scrivner on McKee's claim, as well as to Reuter on Beckie's claim, was affirmed January 8, 2019, on interlocutory appeal. McKee's and Beckie's claims therefore proceeded to trial and, on June 20, 2019, the jury returned its verdicts as described at the beginning of this memorandum. Accordingly, of the several combinations of claims brought by three plaintiffs against six defendants named at one point or another in this case, only one claim prevailed – that of McKee against Michael Reuter.

For McKee's success against Reuter, she seeks to recover attorney's fees and expenses.   For attorney's fees, she pursues two alternate theories of recovery. First, she contends that under her one-third contingency-fee contract with counsel,

she should recover as attorney's fees one-half of the judgment entered in her favor so that, when one-third is deducted from the total amount of judgment and fees, she will retain the full amount of the judgment. Under this theory, she seeks attorney's fees in the amount of $112,500. Alternatively, McKee requests a lodestar fee of $116,800, which she contends represents the number of hours reasonably expended at a reasonable hourly rate of $400. McKee submitted her attorney's timesheet to support this lodestar figure. McKee avers that time expended for counsel's work solely for Susan Hickman and Beckie Hickman – as shown by circled entries on the timesheet – has been excluded from her lodestar calculation.

In response, Reuter argues that counsel's lodestar calculation includes fees for work performed on unsuccessful claims and that such fee should be reduced by either 1) the hours attributable to those unsuccessful claims, or 2) a set amount that accounts for the degree of unsuccessful claims compared to the overall case. Given the difficulty of performing either calculation because of the circumstances of this case, Reuter suggests that a reasonable attorney's fee would be one that meets the reasonable expectations of McKee and her attorney as set out in their contract, that is, one-third of the judgment rendered by the jury's verdict.

The lodestar approach is the centerpiece of attorney's fee awards. *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989). Accordingly, I must make an initial estimate of reasonable attorney's fees by applying prevailing billing rates to the hours

reasonably expended "on successful claims."  *Id.* (citing *Hensley v. Eckerhart*, 461

U.S. 424 (1983)).   I may consider a contigent-fee agreement between counsel and

the prevailing party in determining the overall reasonableness of a fee award, but

such an agreement does not impose an automatic ceiling on the award.   *Id.*

Here, I have carefully reviewed counsel's timesheet and agree with Reuter

that several entries for which McKee seeks to recover fees include time expended on

unsuccessful claims.   Although counsel voluntarily excluded some entries

attributed to work performed "solely" for Susan Hickman and Beckie Hickman,

there are dozens of other entries that include work performed throughout the

litigation on not only Susan's and Beckie's claims but on McKee's unsuccessful

claims.   Some entries for which McKee seeks fees also include work performed on

state-court litigation.   However, because counsel's entries contain only the total

time expended on several tasks and do not itemize the time spent on specific tasks, I

am unable to discern what amount of time was spent on McKee's successful claim

against Reuter, for which attorney's fees are recoverable under § 1988 – as opposed

to unsuccessful claims brought by McKee and the other plaintiffs against the several

defendants in the case.   When faced with this "block-billing" method, district courts

are authorized to apply an overall reduction for inadequate documentation that

hinders the court's ability to conduct a meaningful review.   *Miller v. Woodharbor*

*Molding & Millworks, Inc.*, 174 F.3d 948, 949-50 (8th Cir. 1999) (per curiam);

*Bishop v. Pennington Cty.*, No. CIV. 06-5066-KES, 2009 WL 1364887, at *3-4 (D.S.D. May 14, 2009).   I will do so here.

As described above, this case involved multiple claims pursued by multiple plaintiffs against multiple defendants, and final disposition of the several claims occurred on varied dates over a period of years.   To calculate a precise reduction in fees based on McKee's degree of success in these circumstances would be nearly impossible.

Reuter concedes that the bulk of legal work in the case was devoted to the preparation and prosecution of McKee's successful claim against him.   Of the $116,800 in lodestar fees McKee seeks to recover, I find that half of this amount is reasonable given the limited degree of overall success, counsel's block-billing method, and the expectations of McKee and her counsel as set out in their fee contract.   Indeed, with the adjusted judgment of $150,000, an award of $58,400 in attorney's fees exceeds the one-third contingency fee they agreed to.

McKee also requests $9507.24 in expenses.   As with counsel's timesheet, several requested expenses are in block-billed entries that include expenses attributed to unsuccessful claims and long-ago dismissed parties.   Reuter specifically objects to $1680.23 in requested expenses.   Of these challenged expenses, I will disallow $450 in "expenses" for service of process upon the defendants given that McKee seeks to recover this expense in her bill of costs, to

which Reuter did not object. (*See* ECF 158.) I will also disallow $99.78 in additional challenged expenses because they are attributed solely to dismissed parties and/or dismissed claims. (*E.g.*, copies of transcripts of Sharon Hickman's grievance appeal, medical reports for Susan Hickman, etc.) Of the remaining $1130.45 in challenged expenses, I will disallow half ($565.22) given that the billing entries include expenses incurred on matters other than the sole claim on which McKee prevailed. Accordingly, deducting $450, $99.78, and $565.22 from McKee's requested expenses, I will award McKee $8392.24 in total expenses.

Therefore, I will grant in part and deny in part McKee's motion for award of attorney's fees and expenses, and will award such fees and expenses in the total amount of $66,792.24.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Michael Reuter's Renewed Motion for Judgment as a Matter of Law, for a New Trial or, Alternatively, for Remittitur [172] is **DENIED** to the extent Reuter seeks judgment as a matter of law or a new trial in this action. The motion is **GRANTED** to the extent Reuter seeks a reduction of the punitive damages award**.**

**IT IS FURTHER ORDERED** that the jury's award of punitive damages to plaintiff Jeanette McKee is reduced to $125,000.00.

**IT IS FURTHER ORDERED** that plaintiff Sharon "Beckie" Hickman's

Motion for a New Trial [164] and plaintiff Jeanette McKee's Motion for a New Trial on Her Claims Against Christy Scrivner [165] are **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff Jeanette McKee's Motion and Supplemental Motion for an Award of Attorney's Fees Against Defendant Michael Reuter [159] [160] are **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that plaintiff Jeanette McKee shall recover from defendant Michael Reuter $66,792.24 in attorney's fees and expenses recoverable in this action under 42 U.S.C. § 1988.

**IT IS FURTHER ORDERED** that the Clerk of Court shall **forthwith** tax plaintiff Jeanette McKee's bill of costs [158] as defendant Michael Reuter did not object to the bill.

An Amended Judgment is entered herewith.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of November, 2019.